## COBB *v.* STATE

No. 39883 December 19, 1955 83 So. 2d 833

*Wingo & Finch,* Hattiesburg, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

HALL, J.

At the July 1949 Term of the Circuit Court of Stone County appellant was indicted for the murder

of John Sanders on April 10, 1949. His case was not brought to trial until the July 1954 Term, it having been continued for various reasons from term to term intervening. During these years the appellant has spent most of his time in the Mississippi State Hospital at Whitfield. Prior to the trial on the merits, he was tried on a suggestion of insanity and was found by the jury to be sane. No question is raised with reference to that proceeding. At the trial on the merits he was convicted and sentenced to the penitentiary for life and appeals, assigning four errors. One of these is predicated upon the rule announced in the case of Weathersby v. State, 165 Miss. 207, 147 So. 481, which rule is that where the defendant or the defendant's witnesses are the only eye-witnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the State or by the physical facts or by the facts of common knowledge. A brief statement of the facts demonstrates in our opinion that the appellant's case does not come under this rule.

In the early part of 1949 the appellant made an automobile trip with the deceased to visit their sons who were working in Arizona. For some reason the deceased left Arizona and came back to his home in Mississippi without bringing the appellant with him. According to the proof for the State the appellant threatened to get even with the deceased after he got back to Mississippi. On the day before the killing the appellant and the deceased had a severe exchange of words in Wiggins, Mississippi, regarding the incident. The appellant lives about three and a half miles in a southerly direction from Wiggins at about one mile from the point where a stream known as Four Mile Creek empties into Red Creek. This point is considered good fishing territory. On the day before the killing the deceased took some young men down to the mouth of Four Mile Creek in order

that they might engage in fishing during the night. He left them there with the understanding that he would return the following morning and bring them back to Wiggins. The road which he traveled in getting to the fishing spot was apparently a private road, but used generally by the public, and passed within about 25 feet of the front of appellant's home. Appellant owned a small sawmill by the side of this road about 300 yards from appellant's home. On the following morning, April 10, 1949, the deceased went back to the mouth of Four Mile Creek, in accordance with his promise, for the purpose of bringing the fishermen back home; he was unable to find them and it appeared from the State's evidence that they had run out of bait about midnight and had walked back home but had failed to notify the deceased. Appellant testified that on the morning in question the hawks were bothering his chickens and he took his shotgun and went down in the vicinity of the mill for the purpose of killing the hawks. He said that while he was in the woods he saw the deceased's truck stop at the mill and that the driver thereof, who was too far away for recognition, went to the mill and took a battery which was used in connection with the mill machinery, and put it in the pickup truck which deceased was driving. Appellant was not sure that it was a battery which had been removed so he went to the mill, according to his version, and found that the battery was gone. He thereupon waited until the return of the truck and stopped the deceased and inquired if there was any other truck down the road and deceased told him there was not. According to appellant's version he asked the deceased about the battery, having in the meantime leaned his gun against a small oak tree nearby. Appellant claims that when he asked about the battery deceased suddenly opened the door to the pickup truck, jumped out and attacked the appellant with some kind of an object, striking him over the head

and knocking him down and inflicting two or three wounds on him which broke the skin and caused him to bleed profusely. Appellant claims that he retreated to the point where his gun was leaning against the tree and got hold of the gun; that deceased started on him and he shot the deceased in self-defense. The weapon used was a double barrelled shotgun. He claimed that deceased fell by the side of the truck where his body was lying when others arrived on the scene. He also claimed that he pulled the trigger only one time and that there was only one blast from the gun but that evidently both barrels must have fired simultaneously. Appellant claimed that he went to his home and washed the blood off of his face and shortly afterward one Wirt Evans, who had been hunting, came along and asked appellant if he had seen his dog, appellant told him he had not but told him that he had killed John Sanders, that Sanders had got his battery and jumped on him and he had to kill him. Appellant and his brother-in-law got in Evans' truck and they went to the scene and passed on by for a distance of about 100 yards when appellant said he believed he would get out, that he had something else to do. Evans says that he saw no battery in the body of deceased's truck at the time they passed it. Evans, in company with appellant's brother-in-law, went on to town and notified the sheriff who arrived on the scene in a few minutes. According to the sheriff's testimony a battery was in the body of deceased's truck when he got there. The sheriff testified that it had apparently been thrown into the truck body and in sliding across the metal floor some of the rubber compound on the bottom of the battery had rubbed off on the floor and the battery had not moved from that point. It was shown later that the road from that point down to the mouth of Four Mile Creek was rough and bumpy and the battery had not moved during the supposed trip from the mill down to the creek

mouth and return. It was also shown that the sheriff carried the deceased's truck back to Wiggins and that the battery bounced around on the body of the truck on that trip.

The wounds upon the body of deceased consisted of two. One was a pattern of scattered No. 6 shot approximately 10 or 12 inches in diameter in the area of the right chest. These shot went straight in. The other wound was made by a charge of shot which did not separate and cut one hole approximately one and a half to two inches in diameter and entered the body at approximately the belt line, just left of the center, and ranged downward at an angle of about 45 degrees, penetrating the bladder and large intestines. The shell wadding, as well as the shot were found in this wound. The type and character of these two shots clearly indicates that both were not inflicted by a single pulling of the trigger of the gun.

The sheriff testified that he searched the premises around the scene of the killing and was unable to find any weapon, club, stick or anything else with which appellant had been attacked. He also testified that there was no sign of any wounds upon the head or face or body of the appellant.

It appeared from the testimony of several witnesses that there was a pile of sawdust a short distance from where the body of deceased was found. It was shown that the deceased was killed by the abdominal wound and that he would not have been able to travel after it was inflicted. In the pile of sawdust, 21 feet from the place where the body was lying, there was a big pool of blood which measured 10 or 12 inches in depth but had been covered over with a layer of about one inch of sawdust. In addition to this pool of blood, the loop from deceased's belt was found along with the blood, indicating that the fatal wound was inflicted while deceased was upon this pile of sawdust. There

was no sawdust where deceased was lying and practically no blood was at that point. There are other facts in the record which contradict the story told by the appellant, but we think we have detailed enough to show that it was a question for the jury to determine whether or not appellant's version of the killing should be accepted and in our opinion the rule in the Weathersby case has no application whatsoever to the case now on appeal.

 While the sheriff was on the scene investigating the killing, he had a long talk with the appellant and asked the appellant what he did with the gun. The appellant replied that he did not know, that he threw it down somewhere. The sheriff told the appellant that he wanted the gun and the appellant replied ''Go ahead and look anywhere you want to for it.'' Being unable to find the gun at that time, the sheriff carried the appellant to jail and went back the next day and continued his search for the gun. Being still unable to find the gun he returned again and after the third or fourth search he found a double barrelled shotgun in the smokehouse behind the appellant's residence. It was on the ground and was covered with some comic magazines. Over objection the gun was admitted in evidence but was later excluded. Appellant testified that the gun which the sheriff found was the property of his son in Arizona and was not the gun with which the deceased was slain. Appellant claims that the gun should never have been admitted in evidence in the first place because it was obtained by an illegal search, the sheriff being without a search warrant at the time he found it. We do not think appellant's contention is well taken for the reason that appellant consented to the search for the gun and thereby waived the necessity of the sheriff's obtaining a search warrant. Moreover, we do not think that the appellant was prejudiced by the exhibition of this gun. He admitted that he killed

the deceased with a double barrelled shotgun and it makes no difference what gun may have been used. Faulk v. State, 127 Miss. 894, 90 So. 48; Byrd v. State, 178 Miss. 252, 173 So. 282.

█ █ Appellant also contends that the instructions granted to the State are erroneous in not specifying that the evidence must exclude every reasonable hypothesis consistent with innocence. The appellant himself did not request any instruction embodying the theory for which he contends. In Alexander on Mississippi Jury Instruction, Section 1501, Vol. 1, page 358, it is said: "Where the evidence is partly direct and partly circumstantial, an accused is not entitled to an instruction that the evidence must exclude from their minds every other reasonable theory than that of guilt." And in the footnote there are several Mississippi cases cited to support this text.

█ █ An autopsy on the body of deceased was performed by Dr. M. M. Snelling. He testified and described the wounds which he found. After this part of his testimony he was asked as to what position the deceased would have had to be in when the shot was fired into the lower part of his body, and over objection he testified that the deceased would have had to be either on his knees and leaning forward toward the gun, or he would have had to be lying down and the gun would at that time have to be behind his head and pointed downward. The admission of this testimony is assigned as error, and we think that it was error. It was condemned in Dillard v. State, 58 Miss. 368; Foster v. State, 70 Miss. 755, 12 So. 822; and in Temple v. State, 105 Miss. 449, 62 So. 429. The question arises as to whether or not we should reverse this case for the error indicated. At once we are, confronted with Rule 11 of this Court which provides that "No judgment shall be reversed on the ground of misdirection to the jury, or the improper admission or exclusion of evidence, or for

error as to the matter of pleading or procedure, unless it shall affirmatively appear, from the whole record, that such judgment has resulted in a miscarriage of justice.'' ██ █ Viewing the record as a whole, we are satisfied that the appellant has been proven guilty of murder beyond every reasonable doubt, and we may add to the exclusion of every reasonable hypothesis consistent with innocence. Dr. Snelling was merely giving his opinion as to one of the two positions in which the body of deceased must have been when the fatal wound was inflicted. Regardless of his opinion, we do not see how the jury could have drawn any other conclusion from the evidence in this case. That was the province of the jury regardless of Dr. Snelling's opinion. The trial of this case consumed four days. The record consists of 890 pages. It is a rare case where a trial of such length can be conducted without some slight error creeping into the record. It was apparently for that reason that this Court adopted Rule 11 in order to prevent the reversal of cases unless there has been a miscarriage of justice. We do not think there has been a miscarriage in this case and the judgment of the lower court is therefore affirmed.

Affirmed.

*McGehee*, C. J., and *Kyle, Arrington* and *Gillespie*, JJ., concur.